COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Elder and Bumgardner
Argued at Richmond, Virginia


BETH FABER LEDWITH

v.      Record No. 0098-04-2

JAMES JOSEPH LEDWITH                         MEMORANDUM OPINION* BY
                                                JUDGE LARRY G. ELDER
JAMES JOSEPH LEDWITH                            OCTOBER 12, 2004

v.      Record No. 0154-04-2

BETH FABER LEDWITH


FROM THE CIRCUIT COURT OF HANOVER COUNTY
John Richard Alderman, Judge

Donald K. Butler (Mark B. Michelsen; ButlerCook, L.L.P., on
briefs), for Beth Faber Ledwith.

Barbara S. Picard (Cawthorn, Picard & Rowe, P.C., on briefs), for
James Joseph Ledwith.


Beth Faber Ledwith (wife) and James Joseph Ledwith (husband) appeal from the

equitable distribution and support rulings of the chancellor, following referral of the matter to a

commissioner in chancery.  We hold the trial court erroneously calculated the value of wife's

orthodontic practice for purposes of equitable distribution.  We also hold the trial court's failure

to note a reservation of husband's right to request spousal support and its calculation of the

parties' respective incomes for purposes of child support was erroneous.  Finally, although we

make no comment on the ultimate ruling on the request for child support, we note the entry of an

order on the subject of child support which does not expressly determine the presumptive amount

────────────────────
* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

of support due or fully explain the basis for deviating from that amount does not provide an adequate basis for future modifications of support. Thus, on remand, the trial court should calculate the presumptive amount of support and expressly state its reason for deviating from that amount. As to all other issues on appeal, we find no reversible error. However, in light of our remand on equitable distribution and support, we direct the trial court to consider anew the impact of its rulings on remand on the issues of spousal support and attorney's fees.

I.

On appeal, we consider the evidence on a particular issue in the light most favorable to the party who prevailed on that issue in the trial court. Wilson v. Wilson, 12 Va. App. 1251, 1254, 408 S.E.2d 576, 578 (1991). The burden is on the appellant to show that the trial court's decision was erroneous. Twardy v. Twardy, 14 Va. App. 651, 658, 419 S.E.2d 848, 852 (1992).

A.

GROUNDS OF DIVORCE

"Where dual grounds for divorce exist," the chancellor "can use his sound discretion to select the appropriate grounds upon which he will grant the divorce." Zinkhan v. Zinkhan, 2 Va. App. 200, 210, 342 S.E.2d 658, 663 (1986). One who alleges adultery must prove it by "clear and convincing" evidence. Coe v. Coe, 225 Va. 616, 622, 303 S.E.2d 923, 927 (1983). "[A] court's judgment cannot be based upon speculation, conjecture, surmise, or suspicion . . . ." Id.

Here, the evidence, including wife's admission that she had a sexual relationship with Frank Saunders, her office manager, by September 2001, proved *post-separation* adultery. However, no evidence beyond mere "speculation, conjecture, surmise, or suspicion," Coe, 225 Va. at 622, 303 S.E.2d at 927, indicated wife's relationship with Saunders was sexual *before* the parties separated on November 19, 1999. The trial court's statement that "a divorce . . . based

upon . . . the ground of adultery . . . is not supported by clear and convincing evidence" must be considered in light of its express recognition of evidence "suggest[ing] [wife] had embarked on a significant relationship with another man before her separation from [husband]." Based on these observations, we interpret the trial court's statements as a ruling, supported by the evidence, that the record did not contain clear and convincing evidence to establish *pre-separation* adultery and that, given the lack of such evidence, it exercised its discretion to award the divorce based on a one-year separation rather than wife's admitted post-separation adultery. Further, regardless of when the adultery occurred, the trial court acted within its discretion in awarding a divorce based on the parties' one-year separation.

Husband contends the commissioner misstated the law in recommending a no-fault divorce because he indicated "post separation adultery has no impact on equitable distribution of the marital estate, or even whether fees or costs should be awarded." Husband argues the trial court abused its discretion by adopting the commissioner's report containing these misstatements of law. To the extent husband preserved this argument for appeal, we hold that it lacks merit under the facts of this case.

We agree that, even where a court grants a divorce based on a one-year separation, it must still consider any proven fault-based ground in relation to equitable distribution.[1] See Code § 20-107.3(E)(5); see also Seehorn v. Seehorn, 7 Va. App. 375, 384, 375 S.E.2d 7, 12 (1988). The trial court's opinion indicates it did, in fact, consider the evidence of wife's "significant relationship with another man," Office Manager Frank Saunders, in determining how to equitably divide the marital share of wife's orthodontic practice. After expressly acknowledging wife's relationship and the fact that she "rent[ed] another home . . . for [Saunders], well before

---

[1] A spouse's adultery also may serve as a bar to a request for spousal support. Code § 20-107.1(B); Zinkhan, 2 Va. App. at 210, 342 S.E.2d at 263. However, wife did not seek spousal support in this case.

the [parties'] separation," the trial court found that husband's and wife's monetary and nonmonetary contributions were "roughly equal" over the course of the marriage. Thus, to the extent the commissioner's report may have contained a misstatement of the law, the evidence indicates the chancellor did not adopt that misstatement and did, in fact, consider wife's extra-marital relationship in fashioning the equitable distribution. See Gamer v. Gamer, 16 Va. App. 335, 337, 429 S.E.2d 618, 620-21 (1993).

Therefore, we affirm the decision granting a divorce based on a one-year separation.

B.

EQUITABLE DISTRIBUTION

> "Fashioning an equitable distribution award lies within the sound discretion of the trial judge . . . ." Srinivasan v. Srinivasan, 10 Va. App. 728, 732, 396 S.E.2d 675, 678 (1990). Unless it appears from the record that the chancellor has abused his discretion, that he has not considered or has misapplied one of the statutory mandates, or that the evidence fails to support the findings of fact underlying his resolution of the conflict in the equities, the chancellor's equitable distribution award will not be reversed on appeal.

Smoot v. Smoot, 233 Va. 435, 443, 357 S.E.2d 728, 732 (1987).

1. Date of Valuation of Wife's Orthodontic Practice

A court effecting an equitable distribution of marital property "shall determine the value of any such property as of the date of the evidentiary hearing on the evaluation issue. Upon motion of either party . . . the court *may*, for good cause shown, in order to attain the ends of justice, order that a different valuation date be used." Code § 20-107.3(A) (emphasis added).

> Where an asset that is subject to equitable distribution is retained by one of the parties for a period of time . . . before the equitable division occurs and the asset significantly increases or decreases in value during that time through neither the efforts or fault of either party, neither party should disproportionately suffer the loss or benefit from the windfall.

Rowe v. Rowe, 33 Va. App. 250, 263-64, 532 S.E.2d 908, 915 (2000).

- 4 -

Here, wife moved the court to value her practice as of the date of the parties' separation, November 19, 1999, rather than the date of the evidentiary hearing, held two years later on November 20, 2001.[2] Thus, pursuant to Code § 20-107.3(A), she bore the burden of establishing good cause for her request. See Kaufman v. Kaufman, 7 Va. App. 488, 499-500, 375 S.E.2d 374, 380 (1988).

Although the evidence established wife's practice increased in value between the date of the parties' separation and the date of the evidentiary hearing, no evidence established (a) that this increase occurred due to any extraordinary effort on wife's part, beyond the effort she had always expended to run the practice, or (b) that her patient base increased during this time. Further, even if a post-separation increase in patient base *had* been established, such an increase would not necessarily be attributable to wife's personal efforts post-separation. Any increase could just as easily have been attributable to her pre-separation efforts to establish her professional reputation in the community or could have resulted from post-separation factors not directly within her control, such as an increase in population in the four-county area in which she was the only orthodontist.

Finally, as the trial court noted, husband had sold his practice within five years prior to the parties' separation, and the full value of that sale was considered marital property. The evidence, viewed in the light most favorable to husband, established that he made that sale because wife "pushed [him] for several years to make it happen."

Thus, we hold the trial court did not abuse its discretion in concluding wife failed to establish good cause for the proposed alternate valuation date.

---

[2] The dates for which evidence was actually presented were October 31, 1999, and June 30, 2001, because these were the dates closest to the separation and evidentiary hearing for which accurate financial information was available.

2.  Method of Valuation of Wife's Orthodontic Practice

a.  General Valuation Principles

In valuing a business for purposes of equitable distribution, "the standard is that value that represents the property's 'intrinsic worth' to the parties upon divorce."  Peter N. Swisher, Lawrence D. Diehl & James R. Cottrell, Family Law:  Theory, Practice, and Forms § 11-25, at 574 (2004 ed.) (citing Bosserman v. Bosserman, 9 Va. App. 1, 6, 384 S.E.2d 104, 107 (1989)). The value to be determined is fair market value.  Id. at 567 (citing Bosserman, 9 Va. App. at 6, 384 S.E.2d at 107).  However, that value must be net value, and unless the asset is actually being sold or likely to be sold, it is error to consider sales-related expenses in determining value.  Id. at 570.  Where experts present conflicting opinions, the court does not abuse its discretion by selecting a value between those conflicting opinions.  Zipf v. Zipf, 8 Va. App. 387, 395, 382 S.E.2d 263, 268 (1989).

"[G]oodwill is an asset of a professional practice subject to valuation as marital property."  Russell v. Russell, 11 Va. App. 411, 416, 399 S.E.2d 166, 168 (1990).  Not all businesses have a goodwill value, but "if the trial court determines from the greater weight of the evidence that a professional practice has goodwill value, that amount must be subject to valuation as part of the marital property."  Id.

In Russell, we defined goodwill as "'the increased value of the business, over and above the value of its assets, that results from the expectation of continued public patronage.'"  Id. at 415, 399 S.E.2d at 168 (quoting Thomas J. Oldham, Divorce, Separation and the Distribution of Property § 10.03, at 10-20 (1989)).  We said "particular care must be given that future earnings capacity and reputation not be confused with *professional* goodwill."  Id. at 417, 399 S.E.2d at 169 (emphasis added).

- 6 -

We clarified Russell's definition of goodwill in Howell v. Howell, 31 Va. App. 332, 523

S.E.2d 514 (2000), in which we more clearly articulated that

> The value of goodwill can have two components. . . . [I]ndividual,
> *personal*, or separate goodwill[] [hereinafter personal goodwill] is
> attributable to the individual and is categorized as separate
> property in a divorce action. Practice goodwill (also designated as
> business or *commercial* goodwill) [hereinafter commercial
> goodwill] is attributable to the business entity, the professional
> firm, and may be marital property.

Id. at 344, 523 S.E.2d at 520 (emphases added). Thus, Howell indicates that some of the factors

Russell excluded from the definition of goodwill, such as the reputation of the individual, are, in

fact, components of goodwill but that they are classified as personal rather than commercial

goodwill and, thus, are separate property not subject to equitable distribution.

"[T]here are a number of acceptable methods of computing the goodwill value of a

professional practice, and . . . no single method is to be preferred as a matter of law." Russell, 11

Va. App. at 417, 399 S.E.2d at 169.

> In determining the goodwill value, if any, of a professional
> practice, the trial court should specify which method of valuation it
> decides to use based on the expert testimony and the facts
> presented in the case.
>
> . . . [T]he trial court's valuation of goodwill will not be
> disturbed if it appears that the court made a reasonable
> approximation of the goodwill value, if any, of the professional
> practice based on competent evidence and the use of a sound
> method supported by that evidence.

Id. (citations omitted).

"[M]ethods of goodwill valuation . . . recognized by the courts" include the capitalization

of excess earnings method, market value method, and percentage of gross income method. Id. at

416, 399 S.E.2d at 169. The excess earnings method "is based on the difference between what

the [spouse] earned, after expenses, and what [s]he could earn if [s]he went out into the

marketplace as an employee." Id. at 415, 399 S.E.2d at 168. "[T]his calculation is made by

- 7 -

taking the amount of gross income minus expenses of operations, and then subtracting the amount the professional could earn as an employee. If a positive balance results, there are excess earnings which, when capitalized over the number of years the purchaser would be willing to pay in advance for goodwill value, yield the goodwill value of the business or profession." Id. at 415, 399 S.E.2d 168. If the professional could make the same or more as an employee than she made as an owner of the practice being valued, a strict application of this method would lead to the conclusion that the practice has no goodwill value. Id. at 413, 416, 399 S.E.2d at 167, 169.

Under the market value method, "the value of goodwill is determined by computing the difference between the price a business would sell for[] and the value of its non-goodwill assets." Id. at 416, 399 S.E.2d at 169.

Under the percentage of gross income method, the goodwill value of a business is determined to be a percentage of one year's gross earnings. Id. at 413, 416, 399 S.E.2d at 167, 169. What percentage is used in a medical practice may depend upon a variety of factors, including "the specialty, growth, referral base, location, possibility of patient retention, value of fixed assets, history of accounts receivable, . . . and general business management." Id.

In Russell, we affirmed the trial court's decision to reject an expert opinion relying on the excess earnings method and to credit an opinion--given by the same expert providing such an opinion here--that relied on the percentage of gross income method. In Russell, the court found the spouse "had intentionally kept the earnings from his practice at an artificially low level" and that "he could substantially raise the profits from his practice if he chose to do so." Id. at 418, 399 S.E.2d at 169. Under those circumstances, we held it could properly "conclude[] that use of the capitalization of excess earnings method . . . would have allowed him an unfair advantage[;] . . . by intentionally holding his income to a very low level, his practice would have no goodwill value" under this method. Id. at 418, 399 S.E.2d at 169-70.

b.  Expert Testimony on Methods of Valuation

Husband's expert, William K. Stephens, III, a certified public accountant, and wife's expert, Robert R. Raymond, also a certified public accountant, outlined three methods for calculating the value of a professional practice--the income or excess earnings approach, the asset valuation approach, and the market value approach.

Stephens explained the income approach assumes that "the present value of an investment is equal to the sum of the values of all the future benefits the investment is expected to produce for its owner" and "discount[s] [these benefits] to a present value at a discount rate that reflects the time value of money and the degree of risk of the investment."  Stephens opined that the excess earnings approach was the preferred method.   However, Stephens opined that wife's practice had no excess earnings and that this method of valuation thus could not be used in this case.  Raymond agreed the records tended to show no excess earnings.  However, he opined that the income method could have been used to determine a value for the practice "had [it] been properly applied."

Raymond described the market method as comparing the subject company to companies with publicly traded, "guideline" companies or to merger-and-acquisition information for actual sales.  Raymond concluded this was not an appropriate method for use in "[m]ost divorce cases . . . because of the differing standards of value" and because no actual sale was anticipated.

Both experts ultimately used what they called a form of asset valuation, although Raymond claimed Stephens improperly mixed the asset and market approaches by using the asset approach to value the practice and then using a form of the market approach to determine what component of overall value comprised goodwill.

<u>c. Recommendation of Commissioner and Ruling of Court</u>

Here, the commissioner did not expressly base any of his recommendations regarding the value of the practice or its goodwill on the demeanor or perceived credibility of the witnesses. Thus, the trial court was free to reject the commissioner's recommendations on these issues and to determine the value of those items based on the testimony and other evidence in the record. See <u>Kelker v. Schmidt</u>, 34 Va. App. 129, 136-40, 538 S.E.2d 342, 346-47 (2000); <u>see also</u> <u>Snyder Plaza Props., Inc. v. Adams Outdoor Advertising, Inc.</u>, 259 Va. 635, 641, 528 S.E.2d 452, 456 (2000). Nevertheless, the trial court appears to have misperceived the commissioner's recommendation, stating the commissioner valued the practice at $96,000 when his report clearly lists a value of $235,151.50 instead. The court also appears to have applied an erroneous method to value the practice by using an approach appropriate only for determining the value of goodwill.

The value the court assigned to the practice, $450,000, was within the range of values given by the experts. Stephens valued the entire practice at $656,250 and the marital portion of the practice at $480,076 as of June 30, 2001. Wife herself valued the practice at $508,000 in 1997 and $675,000 in 1998. Although Raymond did not value the practice as of June 30, 2001, his 1999 valuation was substantially lower that Stephens's, and he was critical of the methods of valuation Stephens applied for determining 2001 value, supporting a valuation even lower than the one made by the trial court.

The trial court stated that it calculated the value of $450,000 as of the evidentiary hearing "based on [wife's] gross revenues reported on her tax return for 1999 and the earnings estimates for 2000." Raymond testified that gross revenues are irrelevant in calculating the total value of a business, and Stephens provided no testimony that would support a valuation of the business itself based on gross revenues. Although the trial court also mentioned the earnings estimates for

2000, the record contained actual earnings, not estimates, for the year 2000, and those net earnings, $60,365, were substantially lower than the value the trial court placed on the business. Further, the net earnings of $119,970 for 2001, which were an estimate because only figures for the first half of the year were available at the evidentiary hearing in November 2001, also were substantially lower than the value the trial court placed on the business. Thus, the evidence fails to support the method the trial court applied to calculate the value of the business, and we remand for reconsideration of this issue.

Because the trial court's calculation of goodwill was based on an apparently erroneous finding as to value of the practice, we also direct the trial court to reconsider its determination of this figure, as well. However, even assuming the trial court's valuation of the practice as a whole had been based on a proper method, its method for calculating goodwill also appears to be unsupported by the evidence. The trial court acted within its discretion in finding Stephens's testimony about how to calculate goodwill more credible than Raymond's testimony because the commissioner's rejection of Stephens's testimony was based on its substance rather than Stephens's demeanor. Further, in Russell, 11 Va. App. at 416-18, 399 S.E.2d at 168-70, we specifically approved of Stephens's method of taking a percentage of gross income in order to calculate goodwill. Thus, the trial court's decision to use Stephens's method was not error.

Nevertheless, the trial court appears to have erred in the way in which it applied Stephens's method. The trial court used Stephens's figure of forty percent of the overall value of the practice to calculate commercial goodwill and treated the entire goodwill value as marital property subject to equitable distribution. Stephens, however, testified that the goodwill value of the practice comprised both personal and commercial goodwill and that each type of goodwill comprised about half the total value. Thus, the trial court appears to have found no personal goodwill in the value of wife's practice, a finding not supported by the evidence. As we made

- 11 -

clear in Howell, 31 Va. App. at 344, 523 S.E.2d at 520, personal goodwill is a separate asset not subject to distribution. Failure to account for personal goodwill before dividing wife's practice would be error.

### 3. Division of Wife's Orthodontic Practice

Husband contends the trial court abused its discretion in awarding him only 40% of the value of wife's orthodontic practice after finding that the parties made roughly equal monetary and non-monetary contributions to the marriage. We disagree.

No presumption exists in Virginia law favoring an equal division of property. See, e.g., Robinette v. Robinette, 10 Va. App. 480, 486, 393 S.E.2d 629, 633 (1990). Under the facts of this case, we hold the trial court's decision to award husband forty percent of wife's practice was not error.

### 4. Division of Husband's Educational Loan Default Debt

Wife contends the trial court erred in rejecting the commissioner's recommendation regarding the outstanding balance remaining from the default on husband's educational loan. The chancellor owes a degree of deference to the commissioner's factual findings only when those findings are based on express credibility determinations. See, e.g., Kelker, 34 Va. App. at 136-40, 538 S.E.2d at 346-48. Further, no deference is owed to the commissioner's legal conclusions. Jamison v. Jamison, 3 Va. App. 644, 646, 352 S.E.2d 719, 720 (1987). Here, the commissioner made no express credibility determinations, and the chancellor, in fact, made the same finding of fact the commissioner made--that the parties' decision not to go to South Dakota to fulfill husband's National Health Services Corporation (NHSC) commitment was a joint one. The chancellor merely disagreed with the commissioner's recommendation as to the legal conclusion to draw from that fact. We hold settled principles of equitable distribution support the chancellor's legal conclusion.

- 12 -

"All property . . . acquired by either spouse during the marriage . . . is presumed to be marital property in the absence of satisfactory evidence that it is separate property." See Code § 20-107.2(A). This presumption applies to the parties' assets as well as their debts. Cf. Stumbo v. Stumbo, 20 Va. App. 685, 692-93, 460 S.E.2d 591, 595 (1995) (referring to "marital property" as defined in Code § 20-107.3 as including both assets and debts).

Here, the evidence, viewed in the light most favorable to husband, established that husband signed the contract with the NHSC during the parties' marriage, that husband attended the two years of medical school funded by the NHSC during the parties' marriage, and that the parties used the accompanying stipend for joint living expenses during their marriage. The parties jointly decided not to go to South Dakota, which resulted in the $193,000 judgment to which the remaining $108,000 debt is traceable. Although the NHSC obligation was originally incurred to finance a portion of husband's medical school education, it was incurred during the marriage, and wife benefited from that agreement by sharing in the accompanying stipend for living expenses and by sharing in husband's income after he became a physician. Further, husband's default on the NHSC obligation occurred pursuant to the parties' joint decision not to go to South Dakota because it would hinder or at least delay wife's ability to pursue her own career aspirations. Finally, the evidence established wife had student loans that, in contrast to the NHSC default debt, the couple repaid in full during their marriage. The court concluded "that the loan could have been repaid from earnings of both parties over the course of the marriage" and "that there were tax or other financial advantages to both [husband and wife] in keeping the loan outstanding," thereby presumably allowing them to enjoy a higher standard of living during the marriage.

Thus, the NHSC debt was presumed to be marital, and we hold the record supports the trial court's conclusion that wife failed to prove it should have been treated as husband's separate property.

C.

SUPPORT

"Decisions concerning both [spousal and child] support rest within the sound discretion of the trial court . . . ." Calvert v. Calvert, 18 Va. App. 781, 784, 447 S.E.2d 875, 876 (1994).

1. Income Calculations

In computing a party's gross income for child support, Code § 20-108.2(C) requires the inclusion of "all income from all sources." Such income "shall include, but not be limited to, income from salaries, wages, commissions, bonuses, . . . pensions, interest, . . . spousal support, [and] rental income." Code § 20-108.2(C). This income "include[s] nonmonetary as well as cash income." Carmon v. Dep't of Soc. Servs., 21 Va. App. 749, 755, 467 S.E.2d 815, 818 (1996). Gross income "shall be subject to deduction of reasonable business expenses for persons with income from self-employment, a partnership, or a closely held business." Code § 20-108.2(C). A court determining spousal support also shall consider all income of the parties. See Code § 20-107.1.

A spouse's voluntary underemployment may serve as a basis for the trial court to impute income to the underemployed spouse when calculating child and spousal support. See Code §§ 20-107.1, 20-108.1(B), 20-108.2(A); see also Stubblebine v. Stubblebine, 22 Va. App. 703, 708, 473 S.E.2d 72, 74 (1996) (*en banc*); Bennett v. Dep't of Soc. Servs. ex. rel. Bennett, 22 Va. App. 684, 691-92, 472 S.E.2d 668, 672 (1996).

It was undisputed that wife had annual earned income from her orthodontic practice of $180,000. It was also undisputed that she had net rental income of $6,180 per year and non-cash

income in the form of personal use of an automobile paid for by her practice in the amount of $3,512 per year. Per Code §§ 20-107.1 and 20-108.2(C), we hold it was error for the trial court not to include these sums in its calculation of wife's income for purposes of determining spousal and child support and that the court should have calculated wife's income as $189,692.

However, no evidence established that the court committed reversible error in calculating husband's income. It is undisputed that, in the years preceding the evidentiary hearing, husband received $6,000 per year based on his ownership interest in Health Management Center, Inc. Although he claimed he had not been receiving that money in the months prior to the hearing, he conceded on brief that the trial court properly could include that sum in calculating his income for support purposes. He also received net rental income of $18,000 per year and approximately $1,350 annually from Virginia Commonwealth University for his work supervising a medical student. The trial court, by adopting the commissioner's recommendations on this issue, included the Health Management Center income and net rental income of "more than $15,000 per year" in calculating husband's annual income for purposes of support. Finally, the court concluded, based on husband's actual gross income in 1997 through 1999 of $140,000 to $155,000, that husband was capable of earning at least the minimum of those amounts, $140,000, in addition to his net rental income and income from his ownership interest in Health Management Center, Inc. We hold this conclusion was not error.

Husband argues that his testimony regarding his "actual salary" is the only evidence supporting his earning ability and that the court lacked justification for imputing to him additional income beyond that delineated in his employment contract. We disagree. The evidence, viewed in the light most favorable to wife, as recited by the commissioner and adopted by the chancellor, was that husband's actual gross income in 1997 through 1999, the final years of the parties' marriage, was $140,000 to $155,000. Husband's federal W-2 Wage and Tax

Statement from Riverside Physician Services (RPS) for the year 2000 showed wages of $109,611.76. As of the evidentiary hearing on November 20, 2001, husband could not produce his federal income tax return for the year 2000 because he had requested extensions and had not yet filed that return. Pursuant to husband's written employment contract in effect at the time of the evidentiary hearing, husband's total annual compensation from RPS could be as much as $185,000. It is true the contract provided husband's salary could be reduced significantly, up to 25% in any six-month period, and that husband produced a pay stub tending to indicate a significant reduction, but husband's employment contract explained that any such reduction would be based on a decline in husband's production in terms of the number of patients seen as adjusted for the medical conditions for which they were treated. Wife, who had helped husband's practice with its bookkeeping over the years and offered her own and her practice's employees' assistance in trying to increase the efficiency of husband's practice, was allowed to opine that the reason husband's salary had decreased was "[l]ack of systems and amount of time . . . [husband] takes off." She explained that "[h]is salary is based on productivity, and, therefore, the number of the production is not equalling [sic] the salary that he was drawing." Husband testified he was able to see fewer patients, and suffered a corresponding decrease in income, because he "was working with an inadequate staff" and his employer "did an inadequate job of supporting [him] management-wise that year." However, he also said that, by the summer of 2001, he had "[gotten] a staff together that [was] able to support [him] with the schedule that[] [he was] trying to maintain." He said, "If I see enough patients, generate enough charges, I'll maintain my salary where it is[,] . . . and I may even generate a bonus."

Based on this testimony, the commissioner and chancellor were entitled to conclude that husband was capable of earning $140,000 per year in his primary job as a physician for RPS and that his failure to do so amounted to voluntary underemployment.

The court then calculated wife's income as 56% and husband's income as 44% of the whole of their combined incomes of $320,000. This calculation makes clear that it used the job earned income figures for both parties and did not include the additional forms of income such as rents. Had it included these additional figures, it would have arrived at relative percentage figures of 54% for wife and 46% for husband.[3] Because the evidence, viewed in the light most favorable to wife, shows the error was in husband's favor, that error was harmless in the context of the trial court's decision not to award spousal support to husband.

### 2. Child Support and Deviation from Guidelines

Code § 20-108.1(B) provides in relevant part as follows:

> [T]here shall be a rebuttable presumption in any judicial or administrative proceeding for child support . . . that the amount of the award which would result from the application of the guidelines set out in § 20-108.2 is the correct amount of child support to be awarded. . . .
>
> In order to rebut the presumption, the court shall make written findings in the order, which findings may be incorporated by reference, that the application of such guidelines would be unjust or inappropriate in a particular case. The finding that rebuts the guidelines shall state the amount of support that would have been required under the guidelines, shall give a justification of why the order varies from the guidelines, and shall be determined by relevant evidence pertaining to [certain enumerated statutory factors] affecting the obligation, the ability of each party to provide child support, and the best interests of the child . . . .

See also Farley v. Liskey, 12 Va. App. 1, 4, 401 S.E.2d 897, 899 (1991). The judge's written findings must explain why the amount according to the guidelines would be inappropriate or

---

[3] It was undisputed that wife had an aggregate annual income of $189,692. It was also undisputed that, in addition to husband's earned income, an amount which was disputed, the court could attribute to husband at least $15,000 in rent and $6,000 in receipts from his ownership interest in Health Management Services. Thus, using the trial court's imputed job earned income figure for husband of $140,000, husband had a gross income of $161,000 as compared to wife's $189,692. These figures would have resulted in obligations of 46% for husband and 54% for wife. Thus, despite the trial court's apparent error in calculating the parties' gross incomes, that error ultimately inured to husband's benefit rather than his detriment.

unjust and must justify the amount of support awarded. See, e.g., Richardson v. Richardson, 12 Va. App. 18, 22, 401 S.E.2d 894, 896 (1991).

Here, husband's only real objection is to the respective income figures the trial court used to calculate the underlying support obligation. He does not object to the court's deviating from the guideline amount for purposes of requiring the parties to pay for their son's completing Woodberry Forest and their daughter's completing Aylett Country Day School. He merely objects to the trial court's determination that he has an annual income of more than $98,320 and claims that this figure, when compared to wife's annual income of $189,692, entitled him to child support payments of $499. Based on these figures, he also claims he should have been required to pay only 34% of the children's school tuition and other expenses and that wife should have been required to pay 66%.

Again, we disagree. For the reasons set out above in Part I.C.1, , the evidence supported a finding that husband's gross annual income was $161,000. Considered in light of wife's gross annual income of $189,692, the parties had a combined gross annual income of $350,692, for a combined gross monthly income of $29,224.33. Application of the guideline amount, adjusted for the parties' shared custody arrangement, would yield child support of $131.58 to husband rather than $499. However, because the court failed to make an express calculation as to the guideline amount and failed to award husband child support in any amount, we remand to the trial court for consideration of these issues. Although the court's child support award is not necessarily erroneous, the entry of a support order which does not expressly determine the presumptive amount of support due or fully explain the basis for deviating from that amount does not provide an adequate basis for future modifications of support.

3. <u>Husband's Request for Spousal Support and Failure to Reserve Right to Support</u>

In awarding spousal support, the trial court must consider the factors set out in Code § 20-107.1. Decisions concerning spousal support "rest within the sound discretion of the trial court and will not be reversed on appeal unless plainly wrong or unsupported by the evidence." <u>Calvert v. Calvert</u>, 18 Va. App. 781, 784, 447 S.E.2d 875, 876 (1994).

Here, the evidence, viewed in the light most favorable to wife, established that the parties' respective incomes were roughly equal, with wife earning $15,807 per month, or 54% of the parties' combined gross monthly income, and husband earning $13,416, or 46%. The chancellor, by adopting the recommendations of the commissioner, "carefully considered the factors set forth in Virginia Code § 20-107.1 and the evidence presented." In light of the parties' similar educational background, earning power, income history, and other relevant factors, we hold the trial court did not abuse its discretion in denying husband's request for spousal support.

Nevertheless, we conclude the trial court erred in failing to include in the final decree a reservation of husband's right to request spousal support in the future. <u>See</u> <u>Bacon v. Bacon</u>, 3 Va. App. 484, 491, 351 S.E.2d 37, 41 (1996) (holding error not to reserve right if reservation requested). Although the record contains no indication that husband requested such a reservation until after the trial court issued its November 10, 2003 letter opinion, husband implicitly requested it in his exceptions to the final decree, filed the same day the decree was entered, when he objected to the final decree on the ground that it did not reserve his right to a future award of spousal support. Thus, we hold the trial court's failure to amend the final decree to include such a reservation was error, and we direct the trial court to include such a reservation on remand.

D.

ATTORNEY'S FEES

Whether to award attorney's fees and costs rests within the sound discretion of the trial court. See, e.g., Lightburn v. Lightburn, 22 Va. App. 612, 621, 472 S.E.2d 281, 285 (1996).

The commissioner recommended as follows:

> While [wife's] income is significant by any measure, [husband] has the ability to earn nearly as much. [Husband] argues that [wife] used marital funds in providing certain sums to Mr. Saunders *vis-à-vis* the rental residence in Hanover County, Virginia; however, the bulk of those payments were made post-separation and there was no evidence presented that [wife] use[d] marital monies, as opposed to current earnings, to fund those payments. She did, however, expend certain sums without [husband's] knowledge to rent the residence prior to the physical separation. In consideration primarily of those pre-separation expenditures, your Commissioner would recommend that [wife] pay the total sum of $5,000 toward [husband's] attorney's fees.

The trial court adopted the commissioner's recommendation.

Husband contends that he was entitled to a greater award of attorney's fees under all the facts of the case, including wife's adultery, her unreasonable position on certain issues and her use of marital funds to pay some of her paramour's expenses and her own attorney's fees. In the alternative, he claims he should have received a lump sum monetary award.

We perceive no abuse of discretion in the trial court's ruling on husband's request for a larger award of attorney's fees and failure to award husband a lump sum based on his claims that wife used marital assets for an improper purpose. However, based on the court's errors in the equitable distribution, we also remand the issue of attorney's fees and costs for consideration anew in light of the ultimate resolution of the equitable distribution.

III.

We hold the trial court erroneously calculated the value of wife's orthodontic practice for purposes of equitable distribution. We also hold the trial court's failure to note a reservation of

husband's right to request spousal support and its calculation of the parties' respective incomes for purposes of child support was erroneous.  Finally, although we make no comment on the ultimate ruling on the request for child support, we note the entry of an order on the subject of child support which does not expressly determine the presumptive amount of support due or fully explain the basis for deviating from that amount does not provide an adequate basis for future modifications of support.  Thus, on remand, the trial court should calculate the presumptive amount of support and expressly state its reason for deviating from that amount.  As to all other issues on appeal, we find no reversible error.  However, in light of our remand on equitable distribution and support, we direct the trial court to consider anew the impact of its rulings on remand on the issues of spousal support and attorney's fees.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>